UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ELYSSA KOOG and CYNTHIA EVANS,** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**COGNITIVEHEALTH TECHNOLOGIES, LLC,**<br><br>Defendant. | Case No. |

**CLASS ACTION COMPLAINT**

Plaintiffs Elyssa Koog and Cynthia Evans ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against CognitiveHealth Technologies, LLC ("CHT" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action against CHT for its failure to properly secure and safeguard Plaintiffs' and other similarly situated persons' personally identifiable information ("PII") and protected health information ("PHI"), including names, dates of birth, health insurance information, medical histories, and treatment information (the "Private Information"), from criminal hackers. Specifically, CHT posted a Notice of Data Security Event (the "Notice") on its website.[1]

[1] https://www.cognitivehealthit.com/notice (last visited on Nov. 5, 2026).

2. CHT, based in New York, New York, is an AI-powered business automation company that serves healthcare providers (hereinafter, the "Clients" or "Defendant's Clients") across the country.

3. Based on the Notice, unusual activity was detected on some of its computer systems on April 27, 2026. In response, the company initiated an investigation. The CHT investigation revealed that between February 5, 2026 and April 28, 2026, an unauthorized party had access to certain company files containing the Private Information that CHT stored on behalf of its Clients (the "Data Breach").

4. Plaintiffs and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

5. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. The data included, but is not limited to, health insurance information, medical histories, and treatment information that CHT collected and maintained on behalf of its Clients' patients.

6. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, using Class Members' names to obtain medical services and giving false information to police during an arrest.

7. There has been no assurance offered by CHT that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

8. Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm

from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9. Plaintiffs bring this class action lawsuit to address CHT's inadequate safeguarding of Class Members' Private Information that it collected and maintained on behalf of its Clients.

10. The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to CHT, and thus CHT was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

11. Upon information and belief, CHT failed to properly monitor and properly implement security practices with regard to the computer network and systems that housed the Private Information. Had CHT properly monitored its networks, it would have discovered the Breach sooner.

12. Plaintiffs' and Class Members' identities are now at risk because of CHT's negligent conduct as the Private Information that CHT collected and maintained on behalf of its Clients is now in the hands of data thieves and other unauthorized third parties.

13. Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

## II. <u>PARTIES</u>

14. Plaintiff Elyssa Koog is, and at all times mentioned herein was, an individual citizen of the State of California, residing in San Francisco.

15. Plaintiff Cynthia Evans is, and at all times mentioned herein was, an individual citizen of the State of North Carolina, residing in Greenville.

16. Defendant CognitiveHealth Technologies LLC is a limited liability company incorporated in Delaware with its principal place of business at 1345 Avenue of the Americas, 2nd Floor, New York, New York 10105.

## III. JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from CHT. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has jurisdiction over CHT because CHT operates in and/or is incorporated in this District.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and CHT has harmed Class Members residing in this District.

## IV. FACTUAL ALLEGATIONS

### *A. CHT's Business and Collection of Plaintiffs' and Class Members' Private Information*

20. CHT is a healthcare technology and IT consulting company. Founded in 2018, CHT states that, through its AI-powered iCAN™ platform, it provides efficiency and financial improvements for healthcare clients, rapid revenue growth, and a growing leadership role in healthcare RCM automation across the United States. CHT employs more than 20 people and generates approximately $4.44 million in annual revenue.

21. As a condition of receiving healthcare technology and IT consulting services, CHT requires that its Clients entrust it with highly sensitive personal information belonging to their patients. In the ordinary course of receiving service from CHT's Clients, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

22. Because of the highly sensitive and personal nature of the information CHT acquires and stores with respect to its Clients' patients, CHT, upon information and belief, promises to, among other things: keep the Private Information in its possession private; comply with industry standards related to data security and the maintenance of the Private Information in its possession; inform its Clients and their patients of its legal duties relating to data security and comply with all federal and state laws protecting Private Information; only use and release the Private Information in its possession for reasons that relate to the services it provides; and provide adequate notice to its Clients and their patients if their Private Information is disclosed without authorization.

23. Thus, due to the highly sensitive and personal nature of the information CHT acquires and stores with respect to its patients, CHT, upon information and belief, promises to, among other things: keep patients' Private Information private; comply with industry standards related to data security and the maintenance of its patients' Private Information; inform its patients of its legal duties relating to data security and comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services it provides; and provide adequate notice to patients if their Private Information is disclosed without authorization.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, CHT assumed legal and equitable duties it owed to them and knew

or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

25. Plaintiffs and Class Members relied on CHT to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

### *B. The Data Breach and Defendant's Inadequate Notice to Plaintiffs and Class Members*

26. Upon information and belief, and according to Defendant's website Notice, it learned of unauthorized access to its computer systems on April 27, 2026, with such unauthorized access having taken place between February 5, 2026 and April 28, 2026.

27. Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, dates of birth, health insurance information, medical histories, and treatment information, relating to its Clients' patients.

28. Omitted from the website Notice are crucial details like the root cause of the Data Breach, the vulnerabilities exploited, the unauthorized actors responsible for the Data Breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

29. Thus, CHT's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

30. CHT had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

31. Plaintiffs and Class Members provided their Private Information to CHT, either directly or as a result of their interactions with CHT's Clients, with the reasonable expectation and mutual understanding that CHT would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

32. CHT's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

33. CHT knew or should have known that its electronic records would be targeted by cybercriminals.

### *C. The Healthcare Sector is Particularly Susceptible to Data Breaches*

34. CHT was on notice that companies in the healthcare industry are susceptible targets for data breaches.

35. In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[2]

---

[2] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on Nov. 5, 2026).

36. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[3]

37. The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[4] In 2022, the largest growth in compromises occurred in the healthcare sector.[5]

38. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[6]

39. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty

---

[3] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on Nov. 5, 2026).

[4] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2019/01/ITRC_2018-EOY-BREACH-REPORT-KEY-FINDINGS.pdf (last visited on Nov. 5, 2026).

[5] Identity Theft Resource Center, *2022 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on Nov. 5, 2026).

[6] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on Nov. 5, 2026).

percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[7]

40. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8]

41. Moreover, third-party vendors like CHT are an especially common target for hackers. In 2023, approximately 29 percent of all data breaches resulted from a "third-party attack vector," and as much data breach reporting does not specify the attack vector, "the actual percentage of breaches occurring via third parties was probably higher."[9]

42. As a provider of healthcare-related services, CHT knew, or should have known, the importance of safeguarding the Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to the unauthorized exposure of their Private Information to criminal actors. Nevertheless, CHT failed to take adequate cybersecurity measures to prevent the Data Breach or the foreseeable injuries it caused.

---

[7] *Id.*

[8] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Nov. 5, 2026).

[9] *Global Third-Party Cybersecurity Breaches*, SECURITYSCORECARD (2024), *available online at*: https://securityscorecard.com/reports/third-party-cyber-risk/ (last visited on Nov. 5, 2026).

### *D. CHT Failed to Comply with HIPAA*

43. Title II of HIPAA contains what are known as the Administrative Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that HHS create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

44. CHT's Data Breach resulted from a combination of insufficiencies that indicate CHT failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from CHT's Data Breach that CHT either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

45. Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by 45 CFR § 160.103.

46. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

47. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

48. Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

49. Based upon Defendant's publicly available information regarding the Data Breach, Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

50. Based upon Defendant's Notice, CHT reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

51. Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

53. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

55. It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as

a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

56. It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

57. Given the occurrence of the Data Breach and impact such has had on victims' Private Information, it is reasonable for these victims, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

58. In addition, CHT's Data Breach could have been prevented if CHT had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

59. CHT's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information CHT creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(4); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

60. Because CHT has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure CHT's approach to information security is adequate and appropriate going forward. CHT still maintains the PHI and other highly sensitive PII of its Clients' patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

### *E. CHT Failed to Comply with FTC Guidelines*

61. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

62. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[10] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

63. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, and monitor their networks for suspicious activity.

---

[10] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (October 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on Nov. 5, 2026).

64. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65. Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like CHT here. *See, e.g.*, *In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

66. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like CHT of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of CHT's duty in this regard.

67. The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[11]

[11] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on Nov. 5, 2026).

68. As evidenced by the Data Breach, CHT failed to properly implement basic data security practices. CHT's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

69. CHT was at all times fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *F. CHT Failed to Comply with Industry Standards*

70. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

71. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[12]

72. The National Institute of Standards and Technology ("NIST") also recommends

[12] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited on Nov. 5, 2026).

certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.
b. Use security software to protect data.
c. Encrypt sensitive data, at rest and in transit.
d. Conduct regular backups of data.
e. Update security software regularly, automating those updates if possible.
f. Have formal policies for safely disposing of electronic files and old devices.
g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

73. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[13]

---

[13] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Nov. 5, 2026).

74. Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

### *G. CHT Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information*

75. In addition to its obligations under federal and state laws, CHT owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. CHT owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

76. Upon information and belief, CHT breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. CHT's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect the Private Information in its possession;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of the Private Information in its possession;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g. Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

77. Upon information and belief, CHT negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

78. Had CHT remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

79. Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with CHT.

### *H. Plaintiffs and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach.*

80. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such

as data breaches or unauthorized disclosure of data.[14] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

81. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

82. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

83. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

---

[14] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Nov. 5, 2026).

Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

84. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

85. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

86. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

87. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

88. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[15] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

89. Identity thieves can also use stolen personal information such as PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, receiving medical services in the victim's name, and even giving the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

90. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[16] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77 percent experienced financial-related problems;
- 29 percent experienced financial losses exceeding $10,000;
- 40 percent were unable to pay bills;
- 28 percent were turned down for credit or loans;
- 37 percent became indebted;
- 87 percent experienced feelings of anxiety;
- 67 percent experienced difficulty sleeping; and
- 51 percent suffered from panic or anxiety attacks.[17]

---

[15] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Nov. 5, 2026).

[16] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited on Nov. 5, 2026).

[17] *Id.* at 21-25.

91. PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[18]

92. Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

93. While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[19]

94. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

95. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[20]

---

[18] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on Nov. 5, 2026).

[19] *Data Breaches: In the Healthcare Sector,* CENTER FOR INTERNET SECURITY, *available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on Nov. 5, 2026).

[20] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," KAISER HEALTH NEWS (Feb. 7, 2014), *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on Nov. 5, 2026).

96. The ramifications of CHT's failure to keep its patients' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

97. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

98. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[21]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

99. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

100. As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

---

[21] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited on Nov. 5, 2026).

### *I. Plaintiffs' and Class Members' Damages*

*Plaintiff Elyssa Koog's Experience*

101. Upon information and belief, one of CHT's Clients entrusted it with their patients' Private Information, including the Private Information of Plaintiff Koog.

102. When Plaintiff Koog became a patient of Defendant's Client, Defendant required Plaintiff Koog to provide it with substantial amounts of her Private Information, including PHI.

103. Upon information and belief, Plaintiff Koog's Private Information was subject to the Data Breach.

104. Plaintiff Koog would not have provided her Private Information to Defendant or its Client had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

105. Upon information and belief, Plaintiff Koog suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

106. Plaintiff Koog suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff Koog entrusted to Defendant for the purpose of receiving healthcare services from Defendant's Client and which was compromised in, and as a result of, the Data Breach.

107. Plaintiff Koog suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

108. Plaintiff Koog has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as CHT fails to undertake the necessary and appropriate security and training measures to the Private Information.

109. As a result of the Data Breach, Plaintiff Koog has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Koog is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

110. Plaintiff Koog also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Koog through her healthcare provider; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft and fraud she now faces.

111. As a result of the Data Breach, Plaintiff Koog anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Cynthia Evans' Experience*

112. Upon information and belief, one of CHT's Clients entrusted it with their patients' Private Information, including the Private Information of Plaintiff Evans.

113. When Plaintiff Evans became a patient of Defendant's Client, Defendant required Plaintiff Evans to provide it with substantial amounts of her Private Information, including PHI.

114. Upon information and belief, Plaintiff Evans' Private Information was subject to the Data Breach.

115. Plaintiff Evans would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

116. Upon information and belief, Plaintiff Evans suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

117. Plaintiff Evans suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff Evans entrusted to Defendant for the purpose of receiving healthcare services from Defendant's Client and which was compromised in, and as a result of, the Data Breach.

118. Plaintiff Evans suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

119. Plaintiff Evans has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as CHT fails to undertake the necessary and appropriate security and training measures to the Private Information.

120. As a result of the Data Breach, Plaintiff Evans has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling,

and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Evans is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

121. Plaintiff Evans also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Evans through her healthcare provider; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft and fraud she now faces.

122. As a result of the Data Breach, Plaintiff Evans anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Class-Wide Damages*

123. Upon information and belief, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

124. Plaintiffs and Class Members permitted their Private Information to be entrusted to Defendant in order to receive services from Defendant's Clients.

125. Upon information and belief, their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

126. As a direct and proximate result of CHT's actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased

risk of harm, including but not limited to, having medical services billed in their names and other forms of identity theft.

127. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

128. Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

129. The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

130. Plaintiffs and Class Members also lost the benefit of the bargain they made with CHT's Clients. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Upon information and belief, Plaintiffs allege that payments made by CHT's Clients to CHT included payment for cybersecurity protection to protect Plaintiffs' and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiffs and Class Members in the form of elevated prices charged by CHT's Clients for their healthcare services. Thus, Plaintiffs and the Class did not receive what they paid for.

131. Upon information and belief, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust

legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[22] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[23]

132. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

133. Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

134. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of CHT, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

---

[22] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/ (last visited on Nov. 5, 2026).

[23] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on Nov. 5, 2026).

135. As a direct and proximate result of CHT's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V. CLASS ACTION ALLEGATIONS

136. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

137. Specifically, Plaintiffs propose the following Nationwide Class, as well as the following State Subclass definitions (collectively referred to herein as the "Class"), subject to amendment as appropriate:

> **Nationwide Class**
>
> All individuals in the United States who had Private Information impacted as a result of the Data Breach, including all who were sent a notice of the Data Breach.

138. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

139. Plaintiffs reserve the right to modify or amend the definitions of the proposed Nationwide Class, as well as the addition of any subclasses, before the Court determines whether certification is appropriate.

140. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

141. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of patients of CHT's Clients

whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through CHT's records, CHT's Clients' records, Class Members' records, publication notice, self-identification, and other means.

142. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether CHT engaged in the conduct alleged herein;

b. Whether CHT's conduct violated the FTCA and/or HIPAA;

c. When CHT learned of the Data Breach;

d. Whether CHT's response to the Data Breach was adequate;

e. Whether CHT unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether CHT failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether CHT's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether CHT's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether CHT owed a duty to Class Members to safeguard their Private Information;

j. Whether CHT breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether CHT had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m. Whether CHT breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n. Whether CHT knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiffs and Class Members suffered as a result of CHT's misconduct;

p. Whether CHT's conduct was negligent;

q. Whether CHT's conduct was *per se* negligent;

r. Whether CHT was unjustly enriched;

s. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

143. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*,

all Class Members were injured through the common misconduct of CHT. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

144. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

145. Predominance. CHT has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from CHT's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

146. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for CHT. In contrast, conducting this action as a class action presents far fewer management difficulties,

conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

147. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). CHT has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

148. Finally, all members of the proposed Class are readily ascertainable. CHT has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

149. Plaintiffs restate and reallege all of the allegations stated above as if fully set forth herein.

150. CHT knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

151. CHT's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

152. CHT knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. CHT was

on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

153. CHT owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. CHT's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect the Private Information in its possession by using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

154. CHT's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

155. CHT's duty also arose because Defendant was bound by industry standards to protect the confidential Private Information entrusted to it.

156. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and CHT owed them a duty of care to not subject them to an unreasonable risk of harm.

157. Upon information and belief, CHT, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within CHT's possession.

158. Upon information and belief, CHT, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

159. Upon information and belief, CHT, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

160. Upon information and belief, CHT breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
b. Failing to adequately monitor the security of its networks and systems;
c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

161. Upon information and belief, CHT acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

162. CHT had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust CHT with their Private Information was predicated on the understanding that CHT would take adequate security precautions. Moreover, only CHT had the ability to protect its systems (and the Private Information that it stored on them) from attack.

163. CHT's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft and loss of control over their Private Information.

164. CHT's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated as alleged herein.

165. As a result of CHT's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

166. CHT also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

167. As a direct and proximate result of CHT's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

168. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

169. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

170. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring CHT to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

171. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

172. Pursuant to Section 5 of the FTCA, CHT had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

173. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., CHT had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

174. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

175. Upon information and belief, CHT breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

176. Specifically, CHT breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

177. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of CHT's duty in this regard.

178. Upon information and belief, CHT also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

179. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and

Class Members' Private Information in compliance with applicable laws would result in an unauthorized third party gaining access to CHT's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

180. Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and CHT's failure to comply with both constitutes negligence *per se*.

181. Upon information and belief, Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to CHT's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

182. As a direct and proximate result of CHT's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual and potential impact of the Data Breach on their lives.

183. Upon information and belief, as a direct and proximate result of CHT's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

184. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring CHT to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

185. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

186. Defendant entered into contracts, written or implied, with its Clients to perform services that include, but are not limited to, providing healthcare IT services. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country whose patients, including Plaintiffs and Class Members, were affected by the Data Breach.

187. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

188. These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients, its Clients' patients—Plaintiffs and Class Members—would be harmed.

189. Upon information and belief, Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detect the Data Breach and notify Plaintiffs and Class Members thereof.

190. Upon information and belief, Plaintiffs and the Class were harmed by Defendant's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

191. Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## COUNT IV
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

192. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

193. This Count is pleaded in the alternative to Count III above.

194. Plaintiffs and Class Members conferred a benefit on CHT by permitting their healthcare provider to turn over their Private Information to Defendant. Moreover, upon information and belief, Plaintiffs allege that payments made by CHT's Clients to CHT included payment for cybersecurity protection to protect Plaintiffs' and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiffs and Class Members in the form of elevated prices charged by CHT's Clients for their services. Upon information and belief, Plaintiffs and Class Members did not receive such protection.

195. Upon information and belief, CHT funds its data security measures entirely from its general revenue, including from payments made to it by its Clients on behalf of Plaintiffs and Class Members.

196. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to CHT.

197. Upon information and belief, CHT has retained the benefits of its unlawful conduct, including the amounts of payment received indirectly from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

198. CHT knew that Plaintiffs and Class Members conferred a benefit upon it, which CHT accepted. CHT profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

199. If Plaintiffs and Class Members had known that CHT had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

200. Due to CHT's conduct alleged herein, it would be unjust and inequitable under the circumstances for CHT to be permitted to retain the benefit of its wrongful conduct.

201. Upon information and belief, as a direct and proximate result of CHT's conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in CHT's possession and is subject to further unauthorized disclosures so long as CHT fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the

Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

202. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from CHT and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by CHT from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

203. Plaintiffs and Class Members may not have an adequate remedy at law against CHT, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

204. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

205. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

206. CHT owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

207. CHT still possesses Private Information regarding Plaintiffs and Class Members.

208. Plaintiffs allege that CHT's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private

Information and the risk remains that further compromises of their Private Information will occur in the future.

209. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. CHT owes a legal duty to secure its Clients' patients' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

b. CHT's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect patient Private Information; and

c. CHT continues to breach this legal duty by failing to employ reasonable measures to secure its Clients' patients' Private Information.

210. This Court should also issue corresponding prospective injunctive relief requiring CHT to employ adequate security protocols consistent with legal and industry standards to protect patient Private Information in its possession, including the following:

a. Order CHT to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, CHT must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on CHT's systems on a periodic basis, and

ordering CHT to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of CHT's systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its Clients and their patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

211. If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at CHT. The risk of another such breach is real, immediate, and substantial. If another breach at CHT occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

212. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to CHT if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of CHT's

compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and CHT has a pre-existing legal obligation to employ such measures.

213. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at CHT, thus preventing future injury to Plaintiffs, Class Members, and others whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing CHT to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. An order requiring CHT to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all triable issues.

DATED: November 6, 2026

Respectfully submitted,

*/s/ Alyssa Tolentino*

Alyssa Tolentino (NY Bar No. 6195481)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: atolentino@sirillp.com

Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
101 Park Avenue
Suite 1300, #16982799
Oklahoma City, OK 73102
Tel: (929) 274-2944
E: tbean@sirillp.com

Neil P. Williams*
**SIRI & GLIMSTAD LLP**
1901 Main Street
18th Floor #3037
Columbia, South Carolina 29201
Tel: (929) 474-6448
E: nwilliams@sirillp.com

** Pro Hac Vice forthcoming*

*Attorneys for Plaintiffs and the Putative Class*